UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X   Civil Action No.:
ELINA GOLBIN,

                        Plaintiff,

                                    **COMPLAINT**

   – against –

FIRST DATA CORPORATION and                  **JURY TRIAL REQUESTED**
KATHI BENHARDT,

                        Defendants.
------------------------------------------------------------------------X

      Plaintiff, ELINA GOLBIN ("Plaintiff"), by her attorneys, Law Offices of Yale Pollack, P.C., as and for her Complaint against Defendants, FIRST DATA CORPORATION and KATHI BENHARDT, alleges as follows:

## PRELIMINARY STATEMENT

      1.     This is an action for disability discrimination and retaliation by Plaintiff against her former employer, Defendant First Data Corporation ("First Data"), and supervisor, Defendant Kathi Benhardt ("Benhardt").

      2.     Plaintiff is a breast cancer survivor. After being diagnosed with triple negative breast cancer and then undergoing a double mastectomy, aggressive chemotherapy and radiation treatment, Plaintiff thought the worst of her life was over. With treatment behind her and a focus on her future, Plaintiff's desires were simple – to work in an environment where she could successfully contribute to the company while also having the time to take better care of her health. When First Data promised Plaintiff an accommodating work environment, she was excited for the opportunity to help the company grow and improve its HR functions using her past experience and skills.

      3.     During her employment, Plaintiff received nothing but stellar feedback about her

performance, as confirmed in her reviews, by her peers, and recognition awards. Notwithstanding her performance and dedication, First Data turned out to be the most hostile place Plaintiff had ever worked. While First Data should have welcomed such a strong, dedicated and hard-working survivor to its workforce, it instead did everything it could to make Plaintiff feel inferior and take advantage of her disabilities.

4. At no time did First Data ever engage in the interactive process with Plaintiff, let alone provide any of the reasonable accommodations she requested to care for her disabilities as recommended by her doctors. To the contrary, after making her requests, the demands upon Plaintiff would only increase, demonstrating First Data's retaliatory motive to try and force Plaintiff out.

## JURISDICTION AND VENUE

5. The claims in this action arise under the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq.* (the "ADA"), and New York State Human Rights Law, N.Y. Exec. Law §290 *et seq.* (the "NYSHRL").

6. Jurisdiction of this Court is founded on the above federal statutes and 28 U.S.C. §§1331 and 1343.

7. The claims asserted under the NYSHRL arise from the same facts and circumstances as the claims arising under federal law and are within this Court's supplemental jurisdiction under 28 U.S.C. §1367(a).

8. Venue is appropriate in this Court under 28 U.S.C. §1391(b) as the acts or events giving rise to the claims occurred within Eastern District and the residence of First Data is within the Eastern District.

## PROCEDURAL HISTORY

9. On July 24, 2015, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") alleging disability discrimination and retaliation in violation of the ADA.

10. On or about June 23, 2016, the EEOC issued a Notice of Right to Sue, a true and accurate copy of which is attached hereto as Exhibit "A."

## PARTIES

11. Plaintiff is an individual who currently resides in the County of Nassau, State of New York.

12. Upon information and belief, First Data is a domestic corporation with its principal place of business located in the County of Suffolk, State of New York.

13. First Data is an "employer" and "covered entity" as defined by the ADA and the NYSHRL.

14. Upon information and belief, Benhardt is an individual employed by First Data who supervised and/or managed Plaintiff during her employment.

## FACTUAL ALLEGATIONS

15. Plaintiff was diagnosed with breast cancer on July 9, 2012 while working in Manhattan for Credit Suisse, her employer before First Data.

16. Plaintiff underwent a double mastectomy at Memorial Sloan Kettering on July 31, 2012. Thereafter, she endured aggressive chemotherapy and radiation treatment, which lasted into April 2013.

17. Plaintiff was advised by her doctors that the first three (3) years after treatment are the most critical for her health and that her doctors would not even use the term "remission" until

at least five (5) years (i.e. until 2017) after treatment if there were no relapses.

18. For her recovery, Plaintiff's doctors emphasized the importance of her taking care of her body to mitigate against a recurrence by exercising daily, eating healthy, and maintaining low stress levels so that her immune system remained at its best possible condition.

19. Plaintiff returned to work at Credit Suisse in May 2013, ten (10) months after her diagnosis. However, the stress Plaintiff was experiencing due to the long commute into Manhattan required her to start looking for a new job on Long Island in order to adhere to her doctors' orders.

20. In January 2014, Deborah Friedman ("Friedman"), a First Data employee who Plaintiff previously worked with, told Plaintiff about an open position at First Data located on Long Island in Melville, New York.

21. Plaintiff applied for the position with First Data and was offered to interview with the company.

22. During the interview process, Plaintiff openly discussed her battle with breast cancer and the fact that she was looking to work at a place that could provide her with a better work-life balance.

23. First Data assured Plaintiff that it would be able to accommodate her requests, and she was offered the job.

24. On March 4, 2014, Plaintiff emailed her supervisor at the time, John Crawford ("Crawford"), to thank him for the offer. In the email, Plaintiff again advised of her breast cancer history and her need to go to Memorial Sloan Kettering in Manhattan for doctors' appointments a few times per month.

25. Plaintiff began her employment with First Data on April 28, 2014 as Director of Reporting/Analytics in HR.

26. In her position, Plaintiff was responsible for, among other things, creating comprehensive analytics packages in order for First Data to understand its workforce trends. This included reporting on headcount, hiring and attrition rates, planning workforce reductions and expense savings exercises when required by First Data, creating reporting tools for Veteran hiring, reporting on diversity statistics and working with other departments to ensure that they understood their workforce decisions.

27. Most of Plaintiff's duties were computer-based, meaning that she could perform her duties remotely from home.

28. Shortly after commencing her employment, Plaintiff discovered that the balance promised to her by First Data was not going to be fulfilled.

29. Crawford created a stressful environment for Plaintiff by assigning numerous projects to Plaintiff at once with "urgent" deadlines, although it was clear that with some advanced planning, the work could have been completed in a more efficient fashion.

30. To meet the unreasonable demands set by Crawford, Plaintiff was working at least twelve (12) hour days, a far cry from what was assured to her prior to her hire.

31. Due to the chaotic and unsustainable environment Plaintiff was subjected to, in Spring of 2014, she met with management of human resources, including Tammy Sala ("Sala"), on multiple occasions to express her concerns for her health.

32. In their meetings, Plaintiff suggested modifications to her work schedule and/or to the supervisory methods of Crawford, reminding that she made the move to First Data under pretenses that she would be working normal business hours in the office (as opposed to twelve (12) hour days).

33. Although Plaintiff's requests for an accommodation were reasonable and would not

have placed an undue hardship on First Data, nothing changed.

34. In June 2014, Plaintiff spoke to Crawford to explain how her work environment was affecting her health. She advised that she felt very overwhelmed by the volume of tasks and projects being assigned to her, along with the manner in which they were being assigned, as they were interfering with her ability to properly care for herself.

35. Rather than engage in the interactive process with Plaintiff, Crawford told Plaintiff that she needed to "take a deep breath," that she was "getting too emotional," and that he did not need to know about Plaintiff's doctors' appointments.

36. When Plaintiff realized that Crawford was not going to make any changes, on July 24, 2014, she again spoke with Sala to express her concerns. Plaintiff said that the work environment was negatively impacting her health by causing unnecessary stress due to the hours and management-style. Sala told Plaintiff that they were "supportive of that here" and that things were going to improve because Benhardt was taking over the team.

37. On or about August 1, 2014, Plaintiff received her mid-year review (the "August 2014 Review"). She was rated a "2" (on a scale of "1" through "5," with "1" being the highest rating) and was given positive feedback. She was referred to as a "key hire" due to her work efforts and partnerships, as well as the significant contributions made to the team within a short period of time.

38. The only criticism contained in the August 2014 Review was that Plaintiff needed to "[f]ind the right work/life balance" in career fulfillment and accomplishing her goals.

39. In other words, the August 2014 Review further confirmed that Plaintiff's requests for an accommodation were being ignored, especially given the otherwise positive reference she received by exceeding First Data's expectations of her position.

40. In September 2014, Benhardt took over as Plaintiff's supervisor.

41. When Plaintiff had her first one-on-one meeting with Benhardt, they discussed Plaintiff's health, with Plaintiff reminding Benhardt that she was still being closely monitored by her doctors because of her rare and aggressive form of cancer.

42. During her meetings with Benhardt, Plaintiff again advised that it was important for her to have a better balance so that she could take care of her health because the first three (3) years after treatment were critical to her recovery.

43. In numerous follow-up meetings, Benhardt refused to listen to Plaintiff's accommodation requests, stating that "I feel for you but these are the expectations and they won't change," and that "You of all people should know life is short – you should find something that makes you happy."

44. After the meetings, the demands upon Plaintiff only increased. Instead of working twelve (12) hour days, the days were being stretched into fourteen (14) hour days or longer for ad-hoc exercises.

45. While Plaintiff was working until 10:00 p.m. in the office, Benhardt would leave at 6:00 p.m. or earlier to go care for her children, stating that she would call the office later when she was home.

46. The fact that Benhardt was able to work from home evidences that it would not have been an undue burden to allow Plaintiff to do the same so she could care for her health. However, the accommodation was never provided.

47. The animus First Data fostered towards Plaintiff became more prevalent in December 2014, when she received her year-end review (the "December 2014 Review").

48. Prior to the December 2014 Review, at no time between did First Data indicate

Plaintiff's performance was lacking. Yet, in her December 2014 Review, Plaintiff was downgraded from a "2" to a "3" with no explanation provided in the review as to why.

49. As with the August 2014 Review, the December 2014 Review contained positive comments about Plaintiff's performance, stating that First Data expected that she will succeed in managing a team. Plaintiff was recognized for all of the value-add reporting that she created from scratch across multiple areas, including attrition, Veteran hiring and HR HelpDesk. Her strong work ethic, quality of work, process automation skills and client skills were also noted in the December 2014 Review.

50. As the downgraded rating in the December 2014 Review was not representative of the feedback Plaintiff had been receiving, and the only real change between the August 2014 Review and the December 2014 Review was that Plaintiff had been speaking up more to try and protect her rights, the logical explanation for the downgrade was that Plaintiff was being retaliated against by First Data, in an effort to force her to quit.

51. In the part of the December 2014 Review where Plaintiff was able to include her comments, she reiterated her need for an accommodation to achieve a better balance, along with recommendations as to how that could be achieved, such as dividing the work more equally.

52. In January 2015, Plaintiff met with Benhardt to discuss her disappointment about her December 2014 Review. In response, Benhardt stated that Plaintiff was not "going above and beyond," without explaining what that actually meant or why that critique was absent from the review itself.

53. Also, Benhardt stated that Crawford felt that Plaintiff got "too emotional" during their conversations, which left him feeling uncomfortable. This too made no sense given that Crawford's interactions with Plaintiff had only decreased since Benhardt took over as her

supervisor almost immediately following the August 2014 Review. Moreover, the only conversations Plaintiff had with Crawford that could have made him feel uncomfortable concerned her health and the need for her to care for herself, which were ignored by First Data as nothing was ever done to address her concerns.

54. Thereafter, the work environment continued to get worse for Plaintiff, with things coming to a head in Spring of 2015.

55. Benhardt started creating "emergency" projects for Plaintiff to complete, putting tremendous pressure on her. Despite the urgent deadlines being placed on Plaintiff, Benhardt continued to work substantially less hours in the office and remained committed to her personal life.

56. For example, on Saturday, March 7, 2015, at 3:05 p.m., Benhardt emailed Plaintiff for something "urgent" that she needed the following day. Because Benhardt had a "cheerleading thing all afternoon" the next day, Benhardt demanded that the project be completed by 8:00 a.m. on Sunday, March 8, 2015.

57. Despite the "urgency" of the project, Benhardt excused Friedman, a non-disabled employee who held the same title as Plaintiff, from working over the weekend because it was her birthday.

58. Plaintiff ended up working past midnight on the project, and sent Benhardt the requested materials at 12:04 a.m. on March 8, 2015. Instead of showing any appreciation for the work performed with even a "thank you," Benhardt simply demanded more work from Plaintiff on that Sunday, while Benhardt was attending to her children.

59. In light of what transpired over the weekend, on March 9, 2015, Plaintiff had a one-on-one meeting with Benhardt to advise that the demands being imposed on her were resulting in

increased stress in contravention of her doctors' orders.

60. Plaintiff explained that she had been missing doctors' appointments and physical therapy because of the working hours in the office, and that she had to reschedule a reconstruction surgery scheduled for March 2015 due to the demands being placed on her.

61. Plaintiff also stated that the prolonged hours at the office were causing her physical pain due to the lymphedema she was diagnosed with after her surgery and treatment.

62. When Plaintiff mentioned the lack of any appreciation for the work performed, Benhardt snapped at Plaintiff with inappropriate remarks, such as "What did you think when I said 'all hands on deck' on Friday?"; "What do you want to do – I hear hesitation in your voice?"; and "I feel for you but this is our current work environment. It won't change. If you don't like it, then find something that makes you happy. You of all people know life is short – you should be happy." Benhardt further stated that Plaintiff should be prepared to work the next few weekends.

63. In another futile attempt to protect her statutory rights, Plaintiff met with Barbara Aurecchione ("Aurecchione"), the Head of Employee Relations, on March 10, 2015 to recount her conversation with Benhardt the previous day.

64. Instead of trying to help Plaintiff, Aurecchione defended Benhardt's actions, stating that she was under a lot of pressure from the head of HR. Aurecchione said that things were not going to change and that Plaintiff had to make a choice between her health and her job. In other words, First Data made clear that nothing was going to be done to accommodate Plaintiff's needs.

65. Later that same day, Benhardt approached Plaintiff claiming that the conversation they had the day prior was still on her mind. At the conclusion of the conversation, Benhardt said that she would permit Plaintiff to leave by 6:30 p.m. every day, which would allow Plaintiff to go home to eat and exercise as advised by her doctors, and then attend to any required work from

home (an accommodation Plaintiff had been requesting for almost a year).

66. The accommodation was not granted. Instead, after this discussion, the work days at the office became longer, lasting from 7:30 a.m. until 10:00 p.m. or later on some days.

67. On March 25, 2015, Plaintiff had worked in the office until 10:00 p.m. on a document requested by Benhardt.

68. At 4:20 a.m. on March 26, 2015, Benhardt emailed Plaintiff stating that a document that had been prepared by another team member that evening contained a significant error and needed to be fixed by the morning.

69. Plaintiff arrived at the office at 7:00 a.m. that morning (March 26, 2015) ready to work on the project and emailed Benhardt at 8:01 a.m. for the information to produce what she was looking for. At 8:03 a.m., Benhardt simply stated that they "will discuss when I get in – the deadline has passed."

70. Then, commencing on April 13, 2015, Plaintiff was forced to work consecutive late nights to perform additional unnecessary work created by Benhardt.

71. On April 15, 2015, Plaintiff worked in the office until 11:00 p.m., although Benhardt had left at her usual time. When Plaintiff arrived at home, she logged onto her computer to perform additional work for First Data.

72. The emails from Benhardt continued through the early morning hours of April 16, 2015, including emails at 3:45 a.m. and 4:41 a.m. containing questions she had about the charts provided to her.

73. The work continued to be poured onto Plaintiff that day, resulting in her working in the office until 11:15 p.m. that night.

74. Benhardt left the office for hours during the day, until emailing at 5:42 p.m. to

state that she needed to have a summary printed by 9:00 p.m.

75. Friedman responded that she had to leave at 8:00 p.m., to which Benhardt replied that she understood if Friedman had to leave but that Plaintiff could not leave until Benhardt was "comfortable." Plaintiff did not leave work until after 11:15 p.m. that evening.

76. Realizing that First Data was never going to consider her requests for an accommodation and that non-disabled employees were going to continue to receive preferential treatment, on April 17, 2015, Plaintiff believed she had no choice but to resign from First Data based on the impact the treatment at First Data was taking on her health.

77. On April 17, 2015, at 9:24 a.m., Plaintiff emailed Benhardt asking if she could speak to her. Benhardt did not respond.

78. After Benhardt continued to refuse to respond to Plaintiff, Plaintiff wrote another email to Benhardt at 10:34 a.m. stating that she was offering her resignation because "given the current environment and unsustainable working hours, it is a necessary decision for my health and well-being." Plaintiff offered to stay on for two (2) weeks to transition.

79. Upon receipt of the email, Benhardt immediately called Plaintiff into her office, asking "What were you thinking sending that email?" Benhardt failed to acknowledge that she had ignored the earlier email from Plaintiff attempting to talk to Benhardt beforehand.

80. Benhardt proceeded to tell Plaintiff that she was "clearly not in a good place" and that it was "not conducive for [Plaintiff] to stay longer than today."

81. Benhardt further stated that she was not Plaintiff's "mother" and that the pace at the office were not going to change. Plaintiff attempted to remind Benhardt of the arrangement where Plaintiff was supposed to be able to leave at 6:30 p.m., but Benhardt did not listen. When Plaintiff told Benhardt that the hours and pace had only gotten worse since their conversation in

March 2016, Benhardt was again unsympathetic.

82. Plaintiff was humiliated and attempted to hold back her tears as she left the office, but could not.

83. Plaintiff then met with Sala to discuss her resignation, and Sala cried stating that she was sorry that she was not there for Plaintiff. Sala also commended Plaintiff for standing up to Benhardt, stating that "you join a company, you leave a boss."

84. Plaintiff then assisted Benhardt to transition for her exit, and left the company.

## COUNT ONE

**(Failure to Reasonably Accommodate in Violation of the ADA)**

85. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

86. Plaintiff's conditions as described in this Complaint, including her cancer and lymphedema, constitute disabilities within the meaning of the Americans with Disabilities Amendments Act.

87. Plaintiff's disabilities, when active, substantially limit the operation of her major bodily functions, including functions of the immune system, reproductive system, and normal cell growth.

88. Plaintiff's disabilities, when active, substantially limit Plaintiff's abilities not only to work, but to eat, sleep, engage in sexual relations, reproduce, think, and concentrate.

89. First Data knew of Plaintiff's disabilities, regarded Plaintiff as disabled, and had a record of Plaintiff's disabilities.

90. With a reasonable accommodation that would have placed no undue hardship on First Data, Plaintiff could have performed the essential functions of her position.

91. First Data violated the ADA by failing to accommodate Plaintiff's disabilities or

13

even engaging in the interactive process with Plaintiff.

92. First Data acted intentionally and with malice and/or reckless indifference to Plaintiff's federally protected rights.

93. As a result of First Data's unlawful acts, Plaintiff has suffered and continues to suffer damages, including past and future lost wages and benefits, past and future physical and emotional distress, and other damages including the attorneys' fees and costs incurred in prosecuting this action.

## COUNT TWO

### (Discrimination Based on Disability in Violation of the ADA)

94. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

95. First Data violated the ADA when it constructively discharged Plaintiff's employment because of her disabilities, including by increasing her workload after she made her requests for accommodations.

96. First Data acted intentionally by placing Plaintiff in a position that jeopardized her health by initially advising her that it would accommodate her requests prior to her hire, only to later create an environment where Plaintiff could not care for her health or attend to medical appointments.

97. First Data acted intentionally and with malice and/or reckless indifference to Plaintiff's federally protected rights.

98. As a result of First Data's unlawful acts, Plaintiff has suffered and continues to suffer damages, including past and benefits, past and future physical and emotional distress, and other damages including the attorneys' fees and costs incurred in prosecuting this action.

## COUNT THREE

**(Retaliation in Violation of the ADA)**

99. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

100. Plaintiff participated in protected activities under the ADA by, among other things, requesting a reasonable accommodation and complaining of continued harassment.

101. By increasing the demands upon Plaintiff after she made her accommodation requests and ultimately terminating Plaintiff's employment, First Data unlawfully retaliated against Plaintiff in violation of the ADA.

102. First Data acted intentionally and with malice and/or reckless indifference to Plaintiff's federally protected rights.

103. As a result of First Data's unlawful acts, Plaintiff has suffered and continues to suffer damages, including past wages and benefits, past and future physical and emotional distress, and other damages including the attorneys' fees and costs incurred in prosecuting this action.

## COUNT FOUR

**(Failure to Reasonably Accommodate in Violation of the NYSHRL)**

104. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

105. Plaintiff's conditions as described in this Complaint, including her cancer and lymphedema, constitute disabilities within the meaning of the NYSHRL.

106. First Data violated the NYSHRL by failing to accommodate Plaintiff's disabilities or even engaging in the interactive process with Plaintiff.

107. First Data acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

108. As a result of First Data's unlawful acts, Plaintiff has suffered and continues to

suffer damages, including past and future lost wages and benefits, past and future physical and emotional distress, and other damages including the attorneys' fees and costs incurred in prosecuting this action.

## COUNT FIVE

### (Discrimination Based on Disability in Violation of the NYSHRL)

109. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

110. First Data violated the NYSHRL when it constructively discharged Plaintiff's employment because of her disabilities and increasing her workload after she made her requests for accommodations.

111. First Data acted intentionally by placing Plaintiff in a position that jeopardized her health by initially advising her that it would accommodate her requests prior to her hire, only to later create an environment where Plaintiff could not care for her health or attend to medical appointments.

112. First Data acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

113. As a result of First Data's unlawful acts, Plaintiff has suffered and continues to suffer damages, including past and benefits, past and future physical and emotional distress, and other damages including the attorneys' fees and costs incurred in prosecuting this action.

## COUNT SIX

### (Retaliation in Violation of the NYSHRL)

114. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

115. Plaintiff participated in protected activities under the NYSHRL by, among other things, requesting a reasonable accommodation and complaining of continued harassment.

16

116. By increasing the demands upon Plaintiff after she made her accommodation requests and ultimately terminating Plaintiff's employment, First Data unlawfully retaliated against Plaintiff in violation of the NYSHRL.

117. First Data acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

118. As a result of First Data's unlawful acts, Plaintiff has suffered and continues to suffer damages, including past wages and benefits, past and future physical and emotional distress, and other damages including the attorneys' fees and costs incurred in prosecuting this action.

## COUNT SEVEN

**(Aiding and Abetting Disability Discrimination in Violation of the NYSHRL)**

119. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

120. As a result of the aforementioned actions, Benhardt discriminated against Plaintiff on account of her disabilities with respect to the terms, conditions and privileges of her employment in violation of the NYSHRL.

121. Benhardt violated the NYSHRL by aiding, abetting, inciting and coercing the unlawful discrimination set forth in this Complaint.

122. Benhardt acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

123. As a result of the Benhardt's unlawful acts, Plaintiff has suffered and continues to suffer damages, including past and future lost wages and benefits, past and future physical and emotional distress, and other damages including the attorneys' fees and costs incurred in prosecuting this action.

## COUNT EIGHT

### (Disability Harassment Under the NYSHRL)

124. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

125. Plaintiff suffered unwelcome harassment while employed by First Data because of her disabilities.

126. The harassment as described herein was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive work environment.

127. First Data acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

128. As a result of the Defendants' unlawful acts, Plaintiff has suffered and continues to suffer damages, including past and future lost wages and benefits, past and future physical and emotional distress, and other damages including the attorneys' fees and costs incurred in prosecuting this action.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims properly triable by a jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court accept jurisdiction over this matter and award her:

(a) Appropriate injunctive relief, including an order restraining Defendants from engaging in further discriminatory and retaliatory conduct asserted herein and, in lieu of reinstatement, award her front pay (including benefits);

(b) Back pay, wages and other lost prerequisite and benefits in an amount to be determined at trial;

     (c)     Compensatory damages including damages for emotional distress, humiliation and pain and suffering;

     (d)     Pre-judgment and post-judgement interest;

     (e)     Reasonable attorneys' fees and costs incurred in the prosecution of this action;

     (f)     Punitive damages for Defendants' malicious, willful and/or reckless disregard for Plaintiff's statutory rights; and

     (g)     Such other legal and equitable relief as may appear to this Court to be just and proper.

Dated: Syosset, New York
         September 20, 2016

           **LAW OFFICES OF YALE POLLACK, P.C.**

By: _____
         Yale Pollack, Esq.
*Attorneys for Plaintiff*
66 Split Rock Road
Syosset, New York 11791
(516) 634-6340